**IN THE COURT OF APPEALS OF IOWA**

No. 14-0714
Filed July 16, 2014

**IN THE INTEREST OF N.T.,**
**Minor Child,**

**M.T., Father,**
       Appellant,

**K.W., Mother,**
       Appellant.
_____

Appeal from the Iowa District Court for Polk County, Joseph W. Seidlin, District Associate Judge.

A father and mother appeal separately from the order terminating their parental rights. **AFFIRMED.**

Lynn C.H. Poschner of Borseth Law Offices, Altoona, for appellant father.

Chelsey N. Handley of Handley Law Firm, P.C., Ankeny, for appellant mother.

Thomas J. Miller, Attorney General, Kathrine S. Miller-Todd, Assistant Attorney General, John P. Sarcone, County Attorney, and Andrea S. Vitzthum, Assistant County Attorney, for appellee State.

Julia A. Ofenbakh of Ofenbakh Law Firm, PLLC, Urbandale, for minor child.

Considered by Danilson, C.J., and Potterfield and McDonald, JJ.

**DANILSON, C.J.**

A mother and a father separately appeal from the order terminating their parental rights to their son, who was born in March 2013. Each parent argues statutory grounds have not been proved,[1] termination is not in the child's best interests, and the juvenile court should have granted an extension of time for

---

[1] The juvenile court terminated each parent's parental rights pursuant to Iowa Code section 232.116(1)(d), (h), and (i) (2013). Section 232.116(1) allows a court to terminate parental rights if:

. . . .
(d) The court finds that both of the following have occurred:
(1) The court has previously adjudicated the child to be a child in need of assistance after finding the child to have been physically or sexually abused or neglected as the result of the acts or omissions of one or both parents, or the court has previously adjudicated a child who is a member of the same family to be a child in need of assistance after such a finding.
(2) Subsequent to the child in need of assistance adjudication, the parents were offered or received services to correct the circumstance which led to the adjudication, and the circumstance continues to exist despite the offer or receipt of services.
. . . .
(h) The court finds that all of the following have occurred:
(1) The child is three years of age or younger.
(2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
(3) The child has been removed from the physical custody of the least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
(4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.
(i) The court finds that all of the following have occurred:
(1) The child meets the definition of child in need of assistance based on a finding of physical or sexual abuse or neglect as a result of the acts or omissions of one or both parents.
(2) There is clear and convincing evidence that the abuse or neglect posed a significant risk to the life of the child or constituted imminent danger to the child.
(3) There is clear and convincing evidence that the offer or receipt of services would not correct the conditions which led to the abuse or neglect of the child within a reasonable period of time.

reunification. However, upon our de novo review of the record, we find clear and convincing evidence supports termination pursuant to Iowa Code section 232.116(1)(h), we come to the same conclusion as the juvenile court that termination is in the child's best interests under section 232.116(2), and we find additional time is not warranted. We therefore affirm the termination of each parent's parental rights.

**I. Background Facts and Proceedings.**

The two-month-old child came to the attention of the department of human services (DHS) in May 2013. The parents had called paramedics to the home when they found blood coming from the child's mouth. The paramedics did not determine medical care was needed at that time. A few days later the parents again called paramedics when they noticed that the child was running a fever and not eating. The child was admitted to the hospital on May 25, 2013, with severe dehydration and was diagnosed with failure to thrive. Nurses reported the father and mother did not seem interested in comforting the child or in the child's care. A resulting child abuse assessment was founded as to both parents for failure to provide adequate food. Medical staff opined the parents were not able to provide adequate care to the child, who in addition to having been admitted "emaciated and weak," was "tongue tied" and had torticollis.[2] The doctors

---

[2] Pursuant to http://www.nlm.nih.gov/medlineplus/ency/article/000749.htm (last visited July 8, 2014): "Torticollis is a twisted neck in which the head is tipped to one side, while the chin is turned to the other. . . . Treating torticollis that is present at birth involves stretching the shortened neck muscle. Passive stretching and positioning are used in infants and small children. These treatments are often successful, especially if they are started within 3 months of birth." The child attended occupational therapy for Torticollis and "made steady and significant progress" and was discharged from occupational therapy on September 9.

determined through a swallow study that the tongue tie issue was not responsible for the child's weight loss. Upon discharge from the hospital, the child was placed in foster care.

The child was adjudicated a child in need of assistance (CINA) on July 24, 2013.[3] Each parent has a history of mental health issues, but neither was being treated when the child was removed.[4] The case plan adopted in the August 1 disposition order called for each parent to obtain a mental health evaluation and follow any and all resulting recommendations. The parents were also to seek employment[5] and participate in parenting classes and Family Safety, Risk, and Permanency (FSRP) services.

An attachment assessment was conducted by licensed social worker Caren Wedeking, with parental interviews taking place in October 2013 (although the father did not attend an appointment to complete the interview, which was scheduled for November 1), and two observed parent-child interactions taking

---

A procedure to correct the child's tongue tie was done on August 6, and the child received speech therapy thereafter.

[3] The CINA adjudication and disposition were not contested by the parents.

[4] A July 2013 report to the court notes:

Both parents have a history of mental illness. [The father] disclosed to the [child protective worker] that he has been diagnosed with ADHD [Attention Deficit Hyperactivity Disorder], [Oppositional Defiant Disorder], OCD [Obsessive Compulsive Disorder], Reactive Attachment Disorder and also described himself as a "slight schizo." [The father] has also described himself as an insomniac. He is prescribed medications for these disorders, but has not taken them for approximately 2.5 years. He feels that he has adequate coping skills and that smoking cigarettes help to calm him down. [The mother] reports that she has previously been diagnosed with ADHD, "slight" depression and OCD. She is not currently taking any medication at this time. [The mother] was seeing a therapist through [Visiting Nurse Services] VNS, but has only seen her a few times. She has not started therapy again, though she has been asked to do so.

[5] Each parent had been involved in the juvenile court system as a minor, and during the course of these proceedings each has been assigned at least one Community Support Advocate (CSA), who provided the client with transportation and employment assistance.

place on January 7 and January 13, 2014. The report was completed on January 17, 2014. Wedeking noted the parents were "unable to take even minimal responsibility" for the child's failure to thrive and expressed concern that returning the child to his parents "may result in the same outcome unless parents are willing to take responsibility." The therapist also recommended the child remain CINA until the parents could provide a safe and stable living environment, noting the parents were codependent in their relationship and each had "unprocessed" prior traumas in their past. It was recommended that both parents complete a psychiatric evaluation, a psychological evaluation, and "be consistent in individual therapy."

A January 22, 2014 report to the court explaining the successes and failures of the parents prepared by DHS social worker Joey Choate, provided in part:

> It remains a significant concern that neither [parent] shows any insight into why [the child] was removed from their care. [The father] has maintained that [the child] was misdiagnosed by the medical professionals at the hospital and that he actually had Rotavirus. . . .
> . . . .
> Before this case came to DHS attention, [the mother] was seeing a therapist through VNS. She only saw this therapist a few times. . . . [The mother] did re-engage in therapy with Tiffany Bandow at The Lotus Center. Tiffany was able to offer her services on a pro-bono basis. [The mother] has been in therapy since October 2, 2013 and has been consistent with her weekly appointments. The therapist did inform this worker that [the mother] did miss her appointment scheduled for December 31, 2013 and has not yet called to reschedule, as of January 17, 2014. The last scheduled appointment that [the mother] attended was on December 12, 2013. . . .
> It has also been the expectation of the Department that [the father] attended individual therapy. He was able to set up an intake through Eyerly Ball in late October. Since that time, [the father] has only one follow-up appointment with Zach Pacha. The FSRP

worker did transport [the father] to the follow-up appointment. [The father] has not scheduled any additional appointments as of the date of this report. . . .

Both parents are currently working with a Community Support Advocate. This worker did speak with [the mother]'s provider, Julie Prochnow. She reported that she started working with [the mother] in August and their meetings have been "pretty consistent." . . . .

Due to the concerns of [DHS], the parents were asked to enroll in and complete a parenting class. The FSRP provider through Mid-Iowa Family Therapy Clinic, David Palmer, assisted the parents in signing up for the Incredible Years Parenting Class for children 0-12 months old. This session started on August 22, 2013. The parents were able to successfully complete the class and received certificates of completion for their participation. The FSRP provider continued to work with the parents on parenting skills during their supervised interactions. He reported that the parents did participate in class and would report to the other people in the class what they were doing with their son. He did not observe any of those claims during the family interactions he observed. It was recommended that the parents also take the 1-3 year old class, which started immediately following the 0-12 month course. The parents did not make it to that class. They were informed that another session of the 1-3 year old course would be taught in January 2014, but they did not sign up for that course either.

. . . .

Transportation has continued to be an issue for these parents. Neither has a car or a valid driver's license. . . .

Neither parent is currently employed, though both have reported that they are actively seeking employment. The parents both have Community Support Advocates who are available to help them look for and apply for jobs. They also both have parent partners who are willing to help. The parents report having applied for several jobs, but the team has questioned how actively the parents are job searching.

. . . .

A PRC [pre-removal conference] was held for the family on June 6, 2013. There have been four follow-up Family Team Meetings since that time held on the following dates: July 8, 2013; August 22, 2013; October 18, 2013; and January 10, 2014. A professional staffing was also held on December 2, 2013. The notes from those meetings have been submitted to the court. The team has been consistent and clear in stating the expectations and concerns regarding the parents and what needs to happen in order for the case to move forward. The parents have shown a

significant lack of follow-through in several areas, especially in making it to necessary scheduled appointments.

. . . .

At the time that the last DHS Case Plan was written for the dispositional hearing, this worker had been informed by [the mother] that she and [the father] had been evicted from their apartment. . . . The couple was not evicted from their apartment. The management did reportedly threaten to evict them, but ultimately did not. [The parents] continue to reside in the same apartment. There were two separate times since the last hearing that the parents feared they were going to be homeless. [The father's] mother has been paying the rent at the apartment. She was reportedly going to cease providing financial assistance at the end of July, then again at the end of November. As of the most recent Family Team Meeting held on January 10, 2014, [the father] reported that his mother will continue to pay rent through June 2014. The Department continues to have concerns about how the couple could maintain a stable home for [the child], as both parents have been unemployed throughout the life of this case.

DHS requested a petition to terminate parental rights be filed by the State "[g]iven the minimal progress" by the parents.

A review hearing was held on January 27, 2014, which continued the child's out-of-home placement. A termination petition was filed that same date.

A permanency hearing/termination trial was held on March 12, 2014. The father and mother testified. The father had attended one of fourteen offered visits with his son in the five weeks before the hearing; the mother had attended four. Both offered lack of transportation as an excuse, although both had received bus passes. The father testified his insomnia had been an issue throughout the juvenile court proceedings, but he had not sought medical treatment to address it. He agreed he drank "exorbitant amounts of caffeine," explaining he "usually drink[s] it during the day to help me stay up for the course of the day." The father testified he had found employment for a week and a half in February but lost the job "because I was suffering from constant migraines."

He testified the migraines were a result of dental decay, but he had not scheduled follow-up appointments for necessary treatment. Neither parent was attending therapy sessions at the time of the termination trial, though the mother indicated she had contacted her therapist the night before to restart sessions. Neither parent had employment. Both acknowledged missing medical appointments for their son, sometimes due to transportation issues, sometimes because they had overslept. Both parents asked the court for additional time to seek reunification if the child was not returned to them immediately.

The juvenile court terminated the parents' rights pursuant to Iowa Code section 232.116(1)(d), (h), and (i). The court found:

> In this case, neither [the mother] nor [the father] is able to care for [N.T.] in their homes at this time. It is unlikely that the child can be safely returned to his mother or father in the foreseeable future. To return the child to his mother or father at this time or in the foreseeable future would subject him to great instability and uncertainty inflicted by his parents. There has not been any resolution to the concerns raised at the time of the child's removal. A parent's past behavior is an important factor in determining what the future holds for a child if returned to the parent's care and custody. . . .
> The current foster family has amply demonstrated that they are the best placement to ensure [the child's] safety, for furthering his long-term nurturing and growth, and for meeting his physical, mental and emotional condition and needs. They are willing and able to adopt the child. Especially for a child as young as this, termination and adoption is the preferred method of establishing permanency for a child who cannot be safely returned home.

The court rejected the parents' request for more time finding reasonable progress had not been made. The court, finally, found no factor weighing against termination existed.

The parents appeal. The father and the mother both contend none of the statutory grounds were satisfactorily shown, termination is not in the child's best interests, and additional time should have been granted.

## II. Scope and Standard of Review.

We conduct a de novo review of termination of parental rights proceedings. *In re H.S.*, 805 N.W.2d 737, 745 (Iowa 2011). Although we are not bound by the juvenile court's findings of fact, we do give them weight, especially in assessing the credibility of witnesses. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). An order terminating parental rights will be upheld if there is clear and convincing evidence of grounds for termination under section 232.116. *Id.* Evidence is considered "clear and convincing" when there are no "serious or substantial doubts as to the correctness or conclusions of law drawn from the evidence." *Id.*

## III. Analysis.

Iowa Code chapter 232 termination of parental rights follows a three-step analysis. *In re P.L.*, 778 N.W.2d 33, 39 (Iowa 2010). The court must initially determine whether a ground for termination under section 232.116(1) is established. *Id.* If a ground for termination is established, the court must next apply the best-interest framework set out in section 232.116(2) to decide if the grounds for termination should result in a termination of parental rights. *Id.* If the statutory best-interest framework supports termination of parental rights, the court must finally consider if any statutory exceptions or factors set out in section 232.116(3) weigh against termination of parental rights. *Id.*

When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record. *D.W.*, 791 N.W.2d at 707. Under Iowa Code section 232.116(1)(h), the court may terminate the rights of a parent to a child if: (1) the child is three years old or younger, (2) the child has been adjudicated a CINA under section 232.96, (3) the child has been out of the parent's custody for at least six of the last twelve months or the last six consecutive months, and (4) "[t]here is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time." "[O]ur legislature has carefully constructed a time frame to provide a balance between the parent's efforts and the child's long-term best interests." *D.W.*, 791 N.W.2d at 707. "Ultimately, the issue is not parental culpability but whether the statutory requirements have been met." *In re A.M.*, 843 N.W.2d 100, 111 n.9 (Iowa 2014).

Our de novo review of the record convinces us that even after the offer of numerous services, the parents are still not in a position to care for N.T. without ongoing DHS involvement. They have not moved beyond supervised visits, they have untreated mental health issues, and they show little insight into how their behaviors pose a risk of neglect to the child.

"Even after we have determined that statutory grounds for termination exist, we must still determine whether termination is in the children's best interests." *In re A.B.*, 815 N.W.2d 764, 776 (Iowa 2012); *accord* Iowa Code § 232.116(2). Giving "primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to

the physical, mental, and emotional condition and needs of the child," we conclude termination and adoption is in the child's best interests. *See* Iowa Code § 232.116(2); *accord P.L.*, 778 N.W.2d at 40. "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *Id.*

The parents did request additional time and assert the juvenile court erred in failing to grant them an additional six months to seek reunification. A court has discretion to "continue placement of the child for an additional six months." Iowa Code § 232.104(2)(b); *see also id.* § 232.117(5). This provision requires the court to set forth "factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." *Id.* § 232.104(2)(b); *In re A.A.G.*, 708 N.W.2d 85, 92 (Iowa Ct. App. 2005).

The juvenile court determined additional time was not warranted, stating:

[N]either parent has made significant progress in addressing his or her own mental health needs; and neither has been able to demonstrate the interest or ability to safely care for the child outside of a supervised setting. They have taken no steps to achieve financial independence. It is impossible, then, for the Court to enumerate specific factors, conditions, or expected behavioral changes which would comprise the basis for a determination that the need for removal of the child will no longer exist at the end of an additional six-month period. Therefore, termination is in the best interests of this child.

We agree. We affirm the termination of the parents' parental rights to N.T.

**AFFIRMED.**